## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:16-10767-DJC** |
| | ) | |
| **R.M. PACKER COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:16-10769-DJC** |
| | ) | |
| **TISBURY TOWING and** | ) | |
| **TRANSPORTATION CO., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                              **December 14, 2018**

### I.      Introduction

Plaintiff United States of America ("USA") seeks partial summary judgment on claims

pursuant to the Clean Air Act, 42 U.S.C. § 7413(b), against Defendants Tisbury Towing and Transportation ("Tisbury Towing"), D. 41 in 16-10769, and R.M. Packer Co., Inc., ("R.M. Packer"), D. 44 in 16-10767, (collectively, "Defendants")[1] and the Clean Water Act, 33 U.S.C. §§ 1319(b), against R.M. Packer. For the following reasons, the Court ALLOWS the USA's motion for partial summary judgment against Tisbury Towing, D. 41, and ALLOWS the USA's motion for partial summary judgment against R.M. Packer, D. 44.

## II. Standard of Review

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the undisputed facts establish that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A genuine dispute of material fact occurs when the factual evidence "is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party carries the burden of establishing the "absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000). If the movant satisfies this burden, the non-moving party may not merely refer to allegations or denials in its pleadings. Anderson, 477 U.S. at 256. Instead, it "must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, this requires the production of evidence

---

[1] Given that the claims against Tisbury Towing are brought in Docket No. 16-10769 and against R.M. Packer in Docket No. 16-10767, the references as to the facts are to each docket respectively unless otherwise noted.

that is 'significant[ly] probative.'"  Id. (quoting Anderson, 477 U.S. at 249) (alteration in original).

The Court must "view the record in the light most favorable to the nonmovant, drawing reasonable

inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### III.    Factual Background

### A.    <u>Tisbury Towing</u>

The following facts are undisputed unless otherwise noted.  Tisbury Towing is a marine

transportation company and is regulated by the Massachusetts State Implementation Plan ("SIP").[2]

310 C.M.R. § 7.00; D. 41-2 ¶¶ 4-5; D. 44-3 ¶¶ 4-5.  For at least twenty-five years, Tisbury Towing

has owned a single hull barge called the Rando 200.  D. 41-2 ¶ 6; D. 44-3 ¶ 6; D. 44-3 at n.1.

Under the SIP, the Rando 200 qualifies as a "marine tank vessel," D. 41-2 ¶ 6; D. 44-3 ¶ 6, defined

as "any marine vessel [] capable of carrying liquid bulk cargo in tanks," 310 C.M.R. § 7.00.  Until

December 31, 2015, the Rando 200 was used to transport gasoline from the Tisbury Towing pier

in New Bedford to Martha's Vineyard.  D. 41-2 ¶ 7; D. 44-3 ¶ 7.  Because the Rando 200

transported "organic liquids," Tisbury Towing was subjected to the "Marine Volatile Organic

Liquid Transfer" regulation, pursuant to the SIP, commencing from its 2000 approval until

December 2015, when its' operation ceased.  D. 41-2 ¶ 8; see 310 C.M.R. § 7.24(8)(a).  Under this

regulation, no person may load a marine tank vessel unless it is "vapor tight" or is loaded at less

than atmospheric pressure.  310 C.M.R. § 7.24(8)(e)(1).  Here, the transfer at issue could not be

---

[2] A SIP is a plan for the implementation, maintenance and enforcement of the Clean Air Act within a particular jurisdiction.  42 U.S.C. § 7410(a)(1).  Once such SIP is approved by the Environmental Protection Agency ("EPA"), as the Commonwealth's SIP has been, it is enforceable as a matter of federal law.  42 U.S.C. §§ 7413(a)(1), (b).

done at less than atmospheric pressure[3] so Tisbury Towing's compliance with the regulation turns upon whether the "vapor tight" condition was met.

On November 8, 2011, gasoline was transferred from a tanker trunk into the Rando 200. D. 41-2 ¶ 9; D. 44-3 ¶ 9. Tisbury Towing asserts that this transfer was a "planned test of the barge, Rando 200, for the purpose of complying with all the applicable regulations." D. 44-3 ¶ 9. Daniel Gavin ("Inspector Gavin") and Steven Risi ("Inspector Risi") from the Massachusetts Department of Environmental Protection "(MassDEP"), William Osbahr ("Inspector Osbahr") and Michael Looney from the Environmental Protection Agency ("EPA"), Raymond Colicci ("Colicci") and Nate Pierce from the United States Coast Guard ("Coast Guard") and Captain Paul Bangs ("Captain Bangs"), captain of the Rando 200 at Tisbury Towing observed this loading event. D. 41-2 ¶ 9; D. 44-3 ¶ 9. This loading event revealed that the Rando 200 was not "vapor tight through any of the three available methods set forth in the SIP." D. 41-2 ¶ 10; D. 44-3 ¶ 10; 310 C.M.R. § 7.24(8)(e)(2).[4] That is, Tisbury Towing neither provided documentation of a vapor-tightness pressure test or vapor-tightness leak test conducted in the 12 months prior to the loading event nor conducted a vapor-tightness leak test during the event. D. 44-3 ¶ 10. Moreover, during the loading event, "EPA inspector [] Osbahr and MassDEP inspector [] Gavin ("Inspector Gavin") heard an audible hiss, indicating the presence of a leak, from a pressure vacuum valve." D. 41-2 ¶ 15; D. 44-3 ¶ 15. Both Captain Bangs and Inspector Obahr smelled gasoline, indicative of a vapor leak.

---

[3] The Rando 200 was equipped with a vapor balance recovery system which operates at, not less than, atmospheric pressure. D. 44-3 ¶¶ 12-13.

[4] The options for showing that a vessel is vapor tight are presenting documentation of a vapor tight pressure test prior to loading that was conducted within the last 12 months; presenting documentation prior to loading of a vapor tightness leak test within the last 12 months; or performing a leak test during the loading event in accordance with the method specified in the regulation. 310 C.M.R. § 7.24(8)(e)(2).

D. 41-2 ¶ 16; D. 44-3 ¶ 16. With a device called a Flame Ionization Detector,[5] EPA Inspector Obahr confirmed volatile organic compound ("VOC") vapors on the Rando 200 that exceeded 10,000 parts per million ("ppm") coming from the high velocity pressure vacuum valve. D. 41-2 ¶ 17; D. 44-3 ¶ 17. EPA inspectors also detected and confirmed emissions leaks from the valve using an infrared video camera. D. 41-2 ¶ 18; D. 44-3 ¶ 18. Accordingly, the "inspectors detected and confirmed the presence of a leak through auditory, olfactory, visual and technological means." D. 41-2 ¶ 19; D. 44-3 ¶ 19. As a result, the Coast Guard issued an order on November 8, 2011 to "make repairs prior to loading further cargo onto the Rando 200." D. 41-2 ¶ 20; D. 44-3 ¶ 20. Tisbury Towing contends that it complied with this order. D. 44-3 ¶ 20.

Moreover, Tisbury Towing did not comply with the requirement to submit an Emissions Control Plan to MassDEP within the requisite time frame. 310 C.M.R. § 7.24(8)(f); D. 41-2 ¶ 21; D. 44-3 ¶ 21. An Emission Control Plan is necessary to ensure that a facility like Tisbury Towing's "will not cause or contribute to a condition of air pollution or a violation of any other regulation." 310 C.M.R. § 7.18(20)(g). Within 180 days of the Rando 200's first entry into service or the effective date of the applicable regulation, whichever is later, Tisbury Towing was required to submit such plan to the MassDEP. 310 C.M.R. § 7.18(20)(a)(1); D. 41-2 ¶ 21; D. 44-3 ¶ 21. Since the Rando 200 had been operating since at least 1992 and the regulation became effective upon the EPA's approval of it on April 11, 2000, Tisbury Towing's plan was due no later than October 8, 2000. D. 41-2 ¶ 21; D. 44-3 ¶ 21. As of November 8, 2011, when the loading event described above occurred, Tisbury Towing still had not submitted this plan. D. 41-2 ¶ 22; D. 44-3 ¶ 22. It submitted a draft Emissions Control Plan to the EPA on June 17, 2014, but this draft failed to

---

[5]"A Flame Ionization Detector is a portable monitoring instrument that meets the criteria established by leak detection Method 21." D. 41-2 ¶ 17; D. 44-3 ¶ 1.

comply with the minimum requirements of SIP regulations. D. 41-2 ¶ 24; D. 44-3 ¶ 24. The EPA, MassDEP, Coast Guard and Tisbury Towing subsequently exchanged drafts and comments and Tisbury Towing eventually submitted a revised draft on May 27, 2016, which was approved by MassDEP on April 7, 2017. D. 41-2 ¶¶ 25-26; D. 44-3 ¶¶ 25-26.

### B.    R.M. Packer

#### 1.    *Material Facts Concerning the Clean Air Act*

R.M. Packer owns and operates a Bulk Fuel Facility (the "Facility") in Vineyard Haven, also on Martha's Vineyard, where "[g]asoline and other organic liquids are stored in above-ground tanks and disbursed through a loading rack into tanker trucks for distribution." D. 46-2 ¶ 2; D. 48-3 ¶ 2. Absent air pollution control equipment and practices, the pumping of liquid gasoline into the tanker trucks can displace vapors within the trucks. D. 46-2 ¶ 3; D. 48-3 ¶ 3. These vapors include VOCs and hazardous air pollutants like benzene, toluene and ethylene. D. 46-2 ¶ 4; D. 48-3 ¶ 4. Given the concerns about releasing ozone into the air, 40 C.F.R. §§ 50.9, 50.10, 50.15 and 50.19; D. 46-2 ¶ 4; D. 48-3 ¶ 4, with its potential adverse effects on the respiratory system, the EPA regulates these emissions. D. 46-2 ¶ 4; D. 48-3 ¶ 4. As a result of an EPA administrative action in 2002, R.M. Packer installed emissions control equipment, including a vapor capture system and a secondhand carbon-based Vapor Recovery Unit manufactured by McGill Company. D. 46-2 ¶¶ 8-9; D. 48-3 ¶¶ 8-9. The equipment was installed by Bryer Enterprises and periodically inspected and maintained by Robert Bryer, a principal at Bryer Enterprises. D. 46-2 ¶ 9; D. 48-3 ¶ 9.

On June 10, 2013, the EPA observed a pressure vacuum relief valve emitting VOC vapors via an infrared video camera, which revealed that R.M. Packer had not collected and disposed of all vapors discharged during the transfer of gasoline. D. 46-2 ¶ 11; D. 48-3 ¶ 11. The pressure vacuum relief valve, when properly functioning and maintained, is designed to "prevent a tank

rupture, arising from a high pressure within the system, or an implosion, resulting from a vacuum within the system." D. 46-2 ¶ 12; D. 48-3 ¶ 12. Neither high pressure nor vacuum conditions were present during the June 10, 2013 inspection thereby indicating that the pressure vacuum relief valve was not functioning properly and had not been properly maintained. Id. Moreover, one of the two carbon beds, used to absorb VOC vapors, appeared to emit more VOCs than the other, suggestive of a possible problem with the equipment. Id. Thomas Levanduski, a technician from John Zink Company, LLC inspected the Facility on July 16, 2013 and wrote a report summarizing his observations. D. 46-2 ¶¶ 14-15; D. 48-3 ¶¶ 14-15. Samples of the carbon were taken then and the results, detailing the issues observed, were subsequently provided to R.M. Packer on August 14, 2013. D. 46-2 ¶ 16; D. 48-3 ¶ 16. Thomas Steiner, an engineer from Zink, performed a follow-up comprehensive evaluation on September 17, 2013. D. 46-2 ¶ 17; D. 48-3 ¶ 17. In a report dated October 31, 2013, Steiner compiled his findings and recommendations. Id.

Sometime after Steiner's inspection, R.M. Packer's electrician performed some work on its electrical system and valves and R.M. Packer replaced the pressure vacuum relief valves in either late 2014 or 2015. D. 46-2 ¶ 18; D. 48-3 ¶ 18. R.M. Packer hired Timothy Levanduski (brother of Thomas) to reevaluate its Vapor Recovery Unit. Id. Upon completion of this reevaluation on August 4, 2014, Timothy Levanduski provided a two-page list containing the problems he observed. D. 46-2 ¶ 18; D. 48 ¶ 18. Both Steiner and Timothy Levanduski recommended quarterly preventive maintenance, which R.M. Packer did not implement. D. 46-2 ¶ 22; D. 48-3 ¶ 22. On August 7, 2013, the EPA issued an administrative order (the "Testing Order,") pursuant to the Clean Air Act, 42 U.S.C. § 7414(a)(1), which required R.M. Packer to conduct an emissions test on the Vapor Recovery Unit within thirty days. D. 46-2 ¶ 21; D. 48-3 ¶ 21. R.M. Packer did not conduct this test until June 26, 2015. Id. R.M. Packer's equipment has

now been repaired and its emissions of VOCs are now satisfactory, D. 46-2 ¶ 22; D. 48-3 ¶ 22. The parties dispute, however, that the repairs were prompt and adequate. D. 46-2 ¶ 23; D. 48-3 ¶ 23.

### 2. Material Facts Concerning the Clean Water Act

The Facility, owned by R.M. Packer, includes 188, 190, and 199 Beach Road in Tisbury and lot 34 (an adjacent parcel). D. 46-2 ¶ 38; D. 48-3 ¶ 38. On these properties, R.M. Packer conducts several different industrial operations, which "includes fuel transport and sales, boat repair, and the transport of products over water using barges." D. 46-2 ¶ 38; D. 48-3 ¶ 38. Performing these activities on-site requires R.M. Packer to store and distribute petroleum products, waste and scrap material, welds, sandblasts and to repair and lubricate engines on the properties. Id.

According to R.M. Packer's 2015 Stormwater Pollution Prevention Plan ("SWPPP"), its Facility has four outfalls to navigable water. D. 46-2 ¶ 41; D. 48-3 ¶ 41. During the 2008 SWPPP period, however, R.M. Packer failed to "perform quarterly visual inspections or benchmark monitoring of the outfalls" and thus did not submit data to the EPA as required under the 2008 Multi-Section General Permit ("MSGP") Id. The parties agree that R.M. Packer also did not "perform and document routine inspections and annual comprehensive site evaluations at its Facility," and that it further failed to train its employees on stormwater management. D. 46-2 ¶ 42; D. 48-3 ¶ 42. Consequently, the EPA stormwater inspectors visited the Facility on April 1, 2014, and observed and took photographs of paint chips and debris on the ground of its marine railway. D. 46-2 ¶ 43; D. 48-3 ¶ 43. At this railway, boats are "pulled onto the land on a railway track that extends from the land into the water. In this location, vessel hulls were cleaned through a blasting process." Id. R.M. Packer was required under the 2008 MSGP to implement "Good

Housekeeping Measures." Id. The parties agree that R.M. Packer failed to do so. Id. Moreover, the parties further agree that R.M. Packer failed to "set forth standard operating practices within its 2002 SWPPP, such as prohibiting uncontained blasting and painting during the windy conditions." D. 46-2 ¶ 43; D. 48-3 ¶ 43. It is undisputed that R.M. Packer also failed to comply with the 2008 MSGP by omitting certain properties R.M. Packer owned from its' 2002 SWAPP. D. 46-2 ¶¶ 44, 46, 48; D. 48-3 ¶¶ 44, 46, 48. These omissions were corrected, in part, in R.M. Packer's 2015 SWPPP by including these parcels in the Facility diagrams as well as other application portions of the 2015 SWPPP. D. 46-2 ¶ 46; D. 48-3 ¶ 46. At the 2014 inspection, the EPA determined that R.M. Packer's "2002 SWPPP was outdated and also did not accurately reflect all industrial activity onsite." D. 46-2 ¶ 47; D. 48-3 ¶ 47. On July 29, 2014, pursuant to the Clean Water Act, 33 U.S.C. § 1318(a), the EPA sent R.M. Packer a request for information relating to its stormwater practices ("Section 308 Request"). D. 46-2 ¶ 49; D. 48-3 ¶ 49. Although a response was due within thirty days, R.M. Packer did not submit a response until March 25, 2016. D. 46-2 ¶ 51; D. 48-3 ¶ 51.

IV.     **Procedural History**

On April 21, 2016, USA instituted this action against the Defendants seeking civil penalties and injunctive relief. D. 1 in 16-10769; D. 1 in 16-10767. In the amended complaint, USA asserted claims under the Clean Air Act against Tisbury Towing for "failure to conduct a loading event from a marine tank vessel in a vapor tight manner" ("Claim 1") and failure to submit an emission control plan ("Claim 2"). D. 33 in 16-10769. Against R.M. Packer, the USA asserts claims under the Clean Air Act for failure to operate in a manner consistent with safety and good air pollution control practices ("Claim 1"), failure to timely submit an initial notification ("Claim 2"), failure to timely submit notification of compliance status ("Claim 3"), failure to conduct

monthly leak inspections and maintain records ("Claim 4"), failure to collect and dispose of discharged vapor ("Claim 5"), failure to properly maintain and operate the vapor recovery unit ("Claim 6"), failure to comply with and an EPA issued testing order ("Claim 7"), and claims under the Clean Water Act for failure to perform effluent benchmark monitoring, outfall inspections, facility inspections, site evaluations and employee training ("Claim 8"), failure to minimize discharges related to blasting and painting into receiving waters ("Claim 9"), failure to modify storm water pollution prevention plan ("Claim 10") and failure to comply with request for information letter ("Claim 11"). D. 33 in 16-10767. The USA has now moved for partial summary judgment on liability against Tisbury Towing, D. 41, and R.M. Packer, D. 44. The Court heard arguments and took the matters under advisement. D. 48; D. 52.

## V. Discussion

### A. Claims under the Clean Air Act

#### 1. The USA Is Entitled to Summary Judgment on Its Clean Air Act Claims against Tisbury Towing

##### a. *Tisbury Towing Failed to Conduct a Loading Event in a Vapor-Tight Manner (Claim 1)*

The USA contends that Tisbury Towing failed to demonstrate that its vessel was vapor tight during the loading event as required. D. 41-1 at 9. It is undisputed that during the loading event on November 8, 2011, Tisbury Towing provided no proof of vapor tightness under any of the three methods specified under the regulation and the presence of a leak was confirmed through auditory, olfactory, visual and technological means by the inspectors present, D. 41-2 ¶ 19; D. 44-3 ¶ 19. Tisbury Towing has not produced evidence indicating its compliance with the vapor tightness requirement.

Instead, Tisbury Towing contends that the November 8, 2011 loading event was a "planned test of the Rando 200 for the purpose of complying with all applicable regulations," D. 44-3 ¶ 10; see also D. 44-1 at 2-3, and, therefore, should not give rise to liability. Even if the loading event is properly characterized as a "planned test," the regulatory scheme does not provide any exception for Tisbury Towing's compliance with the regulations in such circumstances. See 310 C.M.R. § 7.24(8)(e)(1). The regulatory obligation to demonstrate vapor tightness is on Tisbury Towing, see 310 C.M.R. 7.24((8)(a), and the undisputed record shows that they failed to do so here. Accordingly, given the absence of any dispute of material fact as to this claim, the Court grants summary judgment to the USA as to Claim 1.

      *b. Tisbury Towing Failed to Submit an Emissions Control Plan As Required (Claim 2)*

Tisbury Towing failed to submit any Emissions Control Plan to the EPA and MassDEP until 2014 even when it is undisputed that it was required to do so by no later than October 8, 2000. D. 41-1 at 11-12, 24.

The parties agree that on June 17, 2014, Tisbury Towing finally submitted a draft emissions control plan to the EPA, which failed to comply with the minimum requirements of the Massachusetts SIP regulations. D. 41-2 ¶ 24; D. 44-3 ¶ 24. A revised draft was submitted on May 27, 2016, and was approved by MassDEP on April 7, 2017. D. 41-2 ¶ 26; D. 44-3 ¶ 26. Tisbury Towing's contention that it was "unaware of the requirement of an emissions control plan until Mr. Packer was advised by the EPA," D. 44-1 at 3, does not excuse the failure. See United States v. International Minerals & Chemical Corp., 402 U.S. 558, 563 (1971) (noting that the "principle that ignorance of the law is no defense applies whether the law be a statute or a duly promulgated and published regulation"). Accordingly, the Court grants summary judgment to the USA on Claim 2 against Tisbury Towing.

## 2. USA Is Entitled to Summary Judgment on the Clean Air Act Claims against R.M. Packer

### a. *R.M. Packer Failed to Operate in a Manner Consistent with Safety and Good Air Pollution Control Practices (Claim 1)*

The USA contends that R.M. Packer is liable for failing to operate in a manner consistent with safety and good air pollution control practices. D. 45 at 13. Specifically, it argues that when the EPA inspected the Facility on June 10, 2013, its "equipment had fallen into disrepair and started leaking harmful emissions." D. 45 at 14. At the time, inspectors detected VOC vapors emitting from a pressure vacuum relief valve, which is connected to the Vapor Recovery Unit. Id. It is also undisputed that the release of VOC vapors indicates R.M. Packer had not gathered and disposed of all discharged vapors during the gasoline transfer and that the pressure vacuum relief valve was not functioning properly and had not been properly maintained. D. 46-2 ¶¶ 11-12; D. 48-3 ¶¶ 11-12. Although R.M. Packer took the steps of hiring Thomas and then Timothy Levanduski and Steiner to inspect and evaluate the Facility, the company did not heed many of these recommendations. In Thomas Levanduski's report, he noted that the unit's vacuum pump was "obsolete," that the carbon beds appear "packed," and that the return pump seal was leaking. D. 44-25 at 6. Carbon samples were also taken to be tested from R.M. Packer's machine on the same date and the results were provided to R.M. Packer on August 14, 2013. D. 46-2 ¶ 16; D. 48-3 ¶ 16. The results warned that, due to the small size of the carbon particles, there was an increased risk of "emissions at the vent stack of the carbon vessel." D. 44-25 at 3.

Steiner recommended R.M. Packer to first address the seal fluid glycol levels and then conduct a basic operating test. D. 44-20 at 7. "If performance was not acceptable, [Steiner] suggested R.M. Packer consider replacing the activated carbon and performing a field capacity test on the liquid ring vacuum pump," or in the alternative, completely replacing the liquid ring pump.

D. 46-2 ¶ 17; D. 48-3 ¶ 17. The parties agree that Steiner's observations demonstrate the equipment was not properly maintained and that Steiner recommended R.M. Packer contract for quarterly maintenance. D. 46-2 ¶ 17; D. 48-3 ¶ 17. With this record as a backdrop, Ralph Packer, President of R.M. Packer, testified that R.M. Packer's emissions control equipment was not properly maintained. D. 46-2 ¶ 20; D. 48-3 ¶ 20; D. 44-3 at 22.

R.M. Packer, however, does dispute the USA's contention that it failed to take immediate and adequate action to repair and maintain its Vapor Recovery Unit. D. 46-2 ¶¶ 18, 23; D. 48-3 ¶¶ 18, 23. Although R.M. Packer replaced its pressure vacuum relief valves in either late 2014 or 2015, it is undisputed that the quarterly preventive maintenance recommended by Steiner and Timothy Levanduski was not implemented. D. 46-2 ¶ 22; D. 48-3 ¶ 22. Moreover, it is undisputed that R.M. Packer did not maintain adequate glycol levels and ceased inspecting the equipment and recording measurements as instructed by the Bryer Manual. D. 46-2 ¶¶ 24-25; D. 48-3 ¶¶ 24-25. It is also undisputed that it was not until June 26, 2015, that R.M. Packer's equipment had been sufficiently repaired indicating acceptable emissions of VOC. 46-2 ¶ 22; 48-3 ¶ 22.

Even if R.M. Packer's equipment did not leak more than 80 milligrams per liter, as this defendant contends, D. 48-1 at 5, it would still not absolve R.M. Packer of its liability for failure to maintain and operate its equipment properly. As 310 C.M.R. § 7.24(2)(a) makes clear, the requirement that "the amount of organic material released to the ambient air is less [than] 80 milligrams per liter of liquid loaded or unloaded" is only one of a series of a requirements that must be met before an operator of a bulk terminator can transfer "organic material with a vapor pressure of 1.5 psi or greater under actual storage conditions." That is, there is still sufficient evidence to determine that it was in violation of at least two of the other prerequisites, specifically that its Facility was not "equipped with a vapor collection and disposal system, which . . .

maintained and operated in accordance with the operating instructions of the manufacturer," see D. 46-2 ¶ 25, and that not all "vapor discharged during transfer of the organic material [was] collected and disposed of by the vapor collection and disposal system," see D. 46-2 ¶ 11; 310 C.M.R. §§ 7.24(2)(a), (1) and (2). Accordingly, the USA is entitled to summary judgment as to Claim 1 against R.M. Packer.

### b. *R.M. Packer Failed to Submit Required Notifications (Claims 2 and 3)*

The Gasoline Distribution Air Standard (the "Standard") requires owners or operators of existing affected sources to submit an initial notification within 120 days of the effective date of the Standard, 40 C.F.R. §§ 63.11083(b), 63.9(b), which was January 10, 2011. Accordingly, R.M. Packer's notification was due by May 10, 2011. The initial notification must include, amongst other things, the address of the physical location of the affected source, an identification of the relevant standard or other requirement, an identification of the types of emission points within the affected source subject to the relevant standard and types of hazardous air pollutants emitted. Id. Here, the parties agree that R.M. Packer has been an affected source, as defined under the Act, since January 10, 2011. D. 46-2 ¶ 26; D. 48-3 ¶ 26. R.M. Packer was required to submit an initial notification no later than May 10, 2011, see 40 C.F.R. § 63.11083(b), and a notification of compliance no later than March 11, 2011, see id. § 63.11093(b). It is undisputed that R.M. Packer did not submit either notification until June 13, 2014. D. 46-2 ¶¶ 26-27; D. 48-1 at 8; D. 48-3 ¶¶ 26-27. Because the record demonstrates no material factual dispute exists as to Claims 2 and 3 against R.M. Packer, the USA is entitled to summary judgment.

### c. *R.M. Packer Failed to Conduct Monthly Leak Inspections and Maintain Records (Claim 4)*

Pursuant to the Gasoline Distribution Air Standard, an owner or operator of a bulk gasoline terminal is required to conduct monthly leak inspections of all equipment in gasoline service. 40

C.F.R. § 63.11089(a). Acceptable detection methods include sight, sound and smell. Id. Additionally, "[a] log book shall be used and shall be signed by the owner or operator at the completion of each inspection." Id. § 63.11089(b). Also, "[a] section of the log book shall contain a list, summary description, or diagram(s) showing the location of all equipment in gasoline service at the facility." Id. Finally, "[e]ach detection of a liquid or vapor leak shall be recorded in the log book." Id.

Upon reviewing R.M. Packer's log book on June 10, 2013, the USA uncovered that "no inspections were logged – and presumptively did not occur – in April, May and June 2012 and January, February and March 2013." D. 45 at 21. R.M. Packer contends that its employees "inspected the equipment for leaks, most times on a daily basis, and filed reports for some of these inspections." D. 48-3 ¶ 28. The underlying record suggests otherwise as Doug Seward, a R.M. Packer employee, testified that monthly inspections ceased when a contractor of R.M. Packer, who had been responsible for conducting the monthly inspections, died and had not been replaced. D. 46-2 ¶ 28. Moreover, Seward testified, contrary to R.M. Packer's suggestion otherwise, that he ceased performing daily inspections "about a few years ago," prior to his 2016 retirement. D. 44-33 at 12. Even assuming that R.M. Packer's position about the occurrence of inspections was supported by the record, it admits that it did not keep a log book and that it performed the inspections "without the associated reporting for most of the applicable time." Id. R.M. Packer was required to both conduct the monthly leak inspections and maintain its records in a log book, which it did not. See 40 C.F.R. §§ 63.11089(a), (b). As such, this Court concludes that the USA is entitled to summary judgment as to Claim 4 against R.M. Packer.

*d. R.M. Packer Failed to Collect and Dispose Discharged Vapor (Claim 5)*

The USA contends that R.M. Packer is also liable for failing to collect and dispose of discharged vapor. D. 45 at 22. It argues that at the time of the EPA inspection on June 10, 2013, R.M. Packer's emissions control equipment released VOC vapors when it loaded gasoline into a tanker truck. D. 45 at 22. The Bulk Terminal Regulation requires that "each loading rack at the bulk terminal [be] equipped with a vapor collection and disposal system" and "any vapor discharged during transfer of the organic material [be] collected and disposed of by the vapor collection and disposal system." 310 C.M.R. §§ 7.24(2)(a)(1), (2). Additionally, " the amount of organic material released to the ambient air [must be] less than 80 milligrams per liter of liquid or unloaded over a six hour period" and any "transfer of organic material [must] take [] place through a submerged fill pipe." Id. §§ 7.24(2)(a)(3), (4). Here, it is undisputed that the release of VOC vapors during the June 10, 2013 inspection demonstrates that R.M. Packer had not collected and disposed of all vapors discharged during the transfer of gasoline. D. 46-2 ¶ 11; D. 48-3 ¶ 11. Whether such emission exceeded 80 milligrams per liter, which R.M. Packer disputes, does not change the Court's analysis since R.M. Packer also otherwise failed to satisfy the requirements of the regulation. Accordingly, the Court grants summary judgment as to Claim 5 against R.M. Packer.

*e. R.M. Packer Failed to Maintain and Operate its Vapor Recovery Unit Properly (Claim 6)*

The SIP requires that "each loading rack at the bulk terminal [must be] equipped with a vapor collection and disposal system, which has been installed and is maintained and operated in accordance with the operating instructions of the manufacturer." 310 C.M.R. § 7.24(2)(a)(1). Here, the installer of R.M. Packer's Vapor Recovery Unit, Bryer Enterprises, provided the operating instructions in its manual ("the Bryer Manual"). D. 46-2 ¶ 24; D. 48-3 ¶ 24. The Bryer

Manual contains instructions on how to properly maintain and operate the Vapor Recovery Unit. D. 46-2 ¶¶ 24-25; D. 48-3 ¶¶ 24-25. Specifically, the Bryer Manual instructed and warned that the "[l]oss of glycol in the [vapor recovery unit] will damage the vacuum pump while a low glycol level will reduce the vacuum pump performance." Id. Additionally, the Bryer Manual provided instructions for proper measuring and recording of several components of R.M. Packer's Vapor Recovery Unit. D. 46-2 ¶ 25; D. 48-3. It is undisputed that R.M. Packer did not maintain adequate glycol levels and that it ceased inspecting the equipment and recording measurements as instructed by the Bryer Manual. Id. R.M. Packer contends that the USA is applying the "wrong standard in defining 'maintenance' of the vapor recovery equipment used by [R.M.] Packer." D. 48-1 at 9. It argues it is being held to a standard that requires its equipment to be "new" rather than "safe, functional and operational." Id. The record, however, does not support this contention. USA's assertion is that R.M. Packer did not operate its Facility and equipment in accordance with Bryer Manual, that R.M. Packer recognized and produced as the governing manual for its operation. Against this backdrop, this Court concludes that the USA is entitled to summary judgment as to Claim 6 against R.M. Packer.

*f. R.M. Packer Failed to Comply with the Testing Order (Claim 7)*

Pursuant to its powers delegated under the Clean Air Act, 42 U.S.C. § 7414(a)(1), the EPA issued a Testing Order on August 7, 2013. D. 46-2 ¶ 21; D. 48-3 ¶ 21. This Testing Order required R.M. Packer to conduct an emissions test on the Vapor Recovery Unit within thirty days. Id. It is undisputed that the test was not conducted until June 26, 2015. Id. R.M. Packer's argument that "honoring the request [of the Testing Order] [] [was] near impossible if not completely impossible . . . due to lack of throughput volume at the Packer facility," D. 48-3 ¶ 33, is not a valid legal

defense as no such exemption exists.  Consequently, this Court finds no genuine dispute of material fact exists and that the USA is entitled to summary judgment as to Claim 7.

**B.     Clean Water Act Claims against R.M. Packer**

The Clean Water Act is a comprehensive program enacted in 1972 intended "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by decreasing and eventually eradicating the discharge of pollutants into those waters.  33 U.S.C. § 1251(a).  Absent a permit issued by the EPA under the National Pollutant Discharge Elimination System ("NPDES"), id. § 1342, the Clean Water Act prohibits all discharges of pollutants from point sources into navigable waters, id.§ 1311(a).   "The [Clean Water Act] shields NPDES permit holders from liability if their discharges comply with their permits."  Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC, 845 F.3d 133, 135 (4th Cir. 2017) (citing 33 U.S.C. § 1342(k)).  "The discharge of pollutants without an NPDES permit, or in violation of a permit, is illegal." Waterkeepers N. Cal. v. AG Indus. Mfg., Inc., 375 F.3d 913, 915 (9th Cir. 2004).  On September 29, 1995, the EPA issued its initial MSGP for stormwater discharges associated with industrial activity.  See www.epa.gov/npdes/pubs/owm0195.pdf (p. 27).  Thereafter, it reissued permits in 2000 ("2000 MSGP"), 2008 ("2008 MSGP") and 2015 ("2015 MSGP"). www.epa.gov/npdes/previous-versions-epas-msgp-documents.   With EPA approval, states are responsible for administering the NPDES permitting system.  See 33 U.S.C. § 1342(b).

**3.     USA is entitled to Summary Judgment on its Clean Water Act Claims against R.M. Packer**

*a.  R.M. Packer Failed to Perform Certain Monitoring, Inspections, Evaluations and Training (Claim 8)*

The USA argues that R.M. Packer is liable for failing to perform required monitoring, inspections, evaluations and trainings.  D. 45 at 8.  It asserts that the "2008 MSGP required R.M.

Packer to perform quarterly benchmark monitoring for each outfall at its Facility." Id. The USA further argues that R.M. Packer was required to "conduct and document quarterly visual assessments of outfalls at its Facility. Id. Sector Q of the 2008 MSGP requires owners or operators to perform and document quarterly effluent benchmark monitoring, §§ 8.Q.6, 9.1.2.5, quarterly visual outfall inspections, § 4.2.2, routine facility inspections, § 4.1.2, annual comprehensive site evaluation inspections, § 4.3, and employee training, § 2.1.2.9. Under the 2008 MSGP, dischargers are required to submit the results of the benchmark monitoring to the EPA within thirty days of receiving them from the laboratory. 2008 MSGP Part 7.1. Additionally, under the 2008 MSGP 8.R.4.3, owners and operators are required to document "any standard operating practices relating to blasting and painting" such as "prohibiting uncontained blasting and painting over open water or prohibiting blasting and painting during windy conditions, which can render containment ineffective."

Here, it is undisputed that R.M. Packer failed to comply with any of these requirements. D. 46-2 ¶ 41; D. 48-3 ¶ 41. First, the parties agree that "R.M. Packer never performed quarterly visual inspections or benchmark monitoring of outfalls during the period coverage under the 2008 MSGP." Id. Second, the parties also agree that R.M. Packer did not submit benchmark monitoring data to EPA as required under Sector Q. Id. Finally, it is undisputed that "R.M. Packer did not perform and document routine inspections and annual comprehensive site evaluations at its Facility" as required under the 2008 MSGP. D. 46-2 ¶ 42; D. 48-3 ¶ 42. In view of these undisputed facts, this Court allows summary judgment as to Claim 8.

### b. *R.M. Packer Failed to Minimize Discharges into Water (Claim 9)*

Under the 2008 and 2015 MSGP, owners and operators are required to take "Good Housekeeping Measures" to limit the "potential for spent abrasives, paint chips, and overspray to

discharge into receiving waters or the storm sewer systems" by taking "measures to minimize the discharge of containments "such as hanging plastic barriers or tarpaulins during blasting or painting operations to contain debris." 8.Q.3.1.2; 8.R.3.1.2. These sections also require owners and operators, when necessary, to "regularly clean stormwater conveyances of deposits of abrasive blasting debris and paint chips." 8.Q.3.1.2; 8.R.3.1.2. Additionally, under 2008 MSGP 8.R.4.3, owners and operators were required to document "any standard operating practices relating to blasting and painting" such as "prohibiting uncontained blasting and painting over open water or prohibiting blasting and painting during windy conditions, which can render containment ineffective." Moreover, Part 5.1.3.3 states that owners or operators were also required to "document where potential spills and leaks could occur that could contribute to pollutants to stormwater discharges, and the corresponding outfall(s) that would be affected by such spills and leaks. . . [and] all significant spills and leaks of hazardous pollutants that actually occurred at exposed areas, or drained to a stormwater conveyance."

Here, it is undisputed that when the EPA inspected the Facility on April 1, 2014, it observed paint chips as well as debris on the ground of its marine railway. D. 46-2 ¶ 43; D. 48-3 ¶ 43. It is undisputed that R.M. Packer failed to practice any of the abovementioned Good Housekeeping Measures to contain debris, in violation of the 2008 MSGP. D. 46-2 ¶ 43; D. 48-3 ¶ 43. In fact, Ralph Packer testified that R.M. Packer did not "implement or document measures to control blasting debris" prior to EPA's 2014 inspection. D. 46-2 ¶ 43; see D. 44-3 at 21. The record is devoid of any other measures R.M. Packer took to prevent or minimize the risk of abrasive and paint chips entering navigable waters, which was required under 2008 MSGP, see 2008 MSGP 8.R.3.1, and is required under 2015 MSGP, see 8.Q.3.1. Accordingly, the Court rules that the USA is entitled to summary judgment as to Claim 9.

### c. *R.M. Packer Failed to Modify its Storm Water Pollution Prevention Plan (Claim 10)*

The USA also argues that R.M. Packer should be held liable for failing to have an adequate SWPPP.  D. 45 at 26.  Under Part 5 of the 2008 MSGP, R.M. Packer was required to implement a SWPPP; under Parts 4.1.1, 4.2.1, and 4.3.1, it must conduct inspections and, under Part 6 of the 2008 MSGP, it must conduct monitoring and sampling.  Additionally, 2015 MSGP Part 6 requires that R.M. Packer submit an updated SWPPP.  Similar to the 2008 MSGP, the 2015 MSGP requires inspections, monitoring and sampling, Parts 3.1, 3.2.  Under the 2008 MSG, R.M. Packer was required to have a SWPPP that reflected the industrial activity and the locations of all stormwater inlets and outfalls and all locations where potential spills and leaks could occur that could contribute to pollution.  5.1.3.3.  It is undisputed that R.M. Packer did not provide a complete copy of its 2002 SWPPP, the only one that it had during the period of coverage under the 2008 MSGP.  D. 46-2 ¶¶ 44-45; D. 48-3 ¶¶ 44-45.  In addition to being outdated, the parties agree that areas of the Facility, together with any description of their industrial activities, outfalls and pollution sources, were omitted in the 2002 SWPPP.  D. 46-2 ¶ 46; D. 48-3 ¶ 46.  Furthermore, it is undisputed that R.M. Packer should have, but did not, include the omitted information in its 2002 SWPPP.  Because there is no genuine dispute of material fact as to this claim, this Court concludes that USA is entitled to summary judgment as to Claim 10.

### d. *R.M. Packer Failed to Comply with the Request for Information from the EPA (Claim 11)*

The EPA is authorized under Section 308(a) of the Clean Air Act to request information pertaining to its stormwater practices.  33 U.S.C. § 1318(a).  On July 29, 2014, the EPA sent a 308(a) request for information to R.M. Packer.  D. 46-2 ¶ 49; D. 48-3 ¶ 49.  This request sought specific information relating to the issues raised by the EPA's April 1, 2014 inspection, topics that

related to R.M. Packer's compliance with the 2008 MSGP and the industrial process of wastewater and stormwater Facility.  D. 46-2 ¶ 50; D. 48-3 ¶ 50.  Under the Act, R.M. Packer was required to respond within thirty days, however, it is undisputed that it did not respond until March 25, 2016. D. 46-2 ¶ 51; D. 48-3 ¶ 51.  For these reasons, the Court grants summary judgment to the USA against R.M. Packer on Claim 11.

## VI.  Conclusion

For the foregoing reasons, the Court ALLOWS USA's motion for a partial summary judgment against Tisbury Towing, D. 41, and ALLOWS USA's motion for partial summary judgment against R.M. Packer, D. 44.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge