**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:16-10767-DJC |
| **R.M. PACKER COMPANY, INC.,** | ) | |
| Defendant. | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:16-10769-DJC |
| **TISBURY TOWING and TRANSPORTATION CO., INC.,** | ) | |
| Defendant. | ) | |

**MEMORANDUM OF DECISION**

**CASPER, J.**                                                                                                          **September 30, 2019**

**I.   Introduction**

Having found liability against Defendants R.M. Packer Co., Inc., ("R.M. Packer") and Tisbury Towing and Transportation ("Tisbury Towing") (collectively, "Defendants") on claims

1

pursuant to the Clean Air Act, 42 U.S.C. § 7413(b) and on claims against R.M. Packer pursuant to the Clean Water Act, 33 U.S.C. §1319(b), D. 55, the Court now turns to the civil penalties and injunctive relief that Plaintiff ("United States" or "the government") now seeks. D. 74-75, 78. After a bench trial over the course of four days and having considered the filings and arguments of the parties, the Court makes the following findings of fact and conclusions of law, incorporating its summary of same in the excerpt of transcript attached hereto.

## II. Legal Standard

To determine the appropriate penalties for Clean Air Act and Clean Water Act violations, the parties agree that the Court should adopt a "bottom-up" approach. D. 75 at 21; D. 77 at 11. Under this approach, the analysis begins with the economic benefit, if any, that the failure to comply gave the Defendants and then the Court considers the other penalty factors to adjust the figure upward so that the penalty constitutes both punishment for non-compliance and deterrence of any future violations. See United States v. Citgo Petroleum Corp., 723 F.3d 547, 552 (5th Cir. 2013) (internal citation omitted); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 890 F. Supp. 470, 492 (D.S.C. 1995).

Under both the Clean Air Act and the Clean Water Act, the other factors for the Court to consider include the Defendants' compliance history and history of violations, the duration of such violations, any good faith efforts to comply, the seriousness of the violations, the size of the business and the economic impact of any penalty on the business. 42 U.S.C. § 7413(e); 33 U.S.C. § 1319(d); see D. 75 at 22-23 and cases cited.

### III.   Discussion

#### A.   Civil Penalties

The Court having already found liability as to both R.M. Packer and Tisbury Towing, the Court will not repeat its factual findings as to same or the incidents of non-compliance that supported those findings, but incorporates its prior Memorandum and Order, D. 55, here. Having considered the evidence as to the relevant penalty factors during the course of the trial, the Court now turns to address each factor. As an initial matter, the Court notes that much of the factual presentation by the government, both from percipient witnesses and expert witnesses, was largely undisputed. Where there were disputes of fact, the Court has addressed them below.

*1.   Economic Benefit to Non-Compliance*

Based upon the unrefuted and persuasive analysis present by Dr. Joan Meyer, an economist, there was an economic benefit to R.M. Packer for its non-compliance with Clean Water Act and Clean Air violations. (Any such benefit to Tisbury Towing was negligible so the government does not press the same argument as to Tisbury Towing, but given the common ownership and operation of the Defendants, the Court has considered this economic benefit in its bottom-up approach as to both). Relying upon information from Jonathan Jones (who testified about, among other things, the reasonable costs of stormwater compliance) and Clement Mesavage (who testified about, among other things, the reasonable costs of air pollution compliance), publicly available records, adjusting for inflation, taxes and depreciation, and subtracting the actual costs of R.M. Packer's compliance efforts from the reasonably estimated costs of full compliance, Dr. Meyer opined that the economic benefit to R.M. Packer of non-compliance was between $84,762 and $110,567. Exh. 293; Meyer testimony. Although Defendants dispute their ability to pay the civil penalty that the government seeks (as discussed below), they presented no evidence

disputing that R.M. Packer reaped an economic benefit from failing to comply with the law and this Court finds that it did so at the upper level of Dr. Meyer's range ($110,567) given the scope and duration of that non-compliance as discussed further below. Accordingly, any penalty should exceed this figure so as to serve as both punishment and deterrence for Defendants. Citgo Petroleum Corp., 723 F.3d at 552.

### 2. *Defendants' History of Non-Compliance*

Chief among the undisputed matters at the bench trial was that R.M. Packer's non-compliance with Clean Air Act and Clean Water Act regulations and Tisbury Towing's non-compliance with Clean Air Act regulations have been ongoing for some time. As to Tisbury Towing, just considering non-compliance with the Clean Air Act violations alleged in this action, its failure to conduct loading events in a vapor tight vessel extends back until November 2011 and spans several years. Exh. 290 at 2; Kudarauskas testimony. The same is true as to its failure to submit an emission control plan, which extends back to April 2010, pursuant to a tolling agreement, and also spans several years. Exh. 290 at 1, 3; Kudarauskas testimony. Similarly, just the multiple (and, in some cases, continuous) instances of non-compliance with both the Clean Air Act and Clean Water Act charged in this case have occurred over the course of years, and as indicated by several witnesses, continue through the present. Exh. 288; Exh. 289; Kudarauskas testimony; Canzano testimony.

Moreover, even before the violations giving rise to this civil action, the EPA had issued a notice of violation and compliance order to R.M. Packer in 2002 for not having a VRU in operation in 1999. D. 75 at 7. As a result, the business was required to make such installation and install the appropriate system. Id. Given that many of the claims in the present case arise out of the failure to maintain and inspect that same system, it is appropriate for the Court to consider that this

4

prior assessment for non-compliance and the longer history of non-compliance that pre-date the facts giving rise to the present claims.

### 3. *Duration of Violations*

As noted above, the duration of these violations by both R.M. Packer and Tisbury Towing has been over an extended period of time. Exhs. 288-90; Kudarauskas testimony; Canzano testimony. Although reciting recent efforts toward achieving full compliance (e.g., recent hiring of a compliance employee) now three years into this litigation, the testimony of Ralph Packer, the president and treasurer of the Defendants, did not dispute the history of non-compliance presented by the government or its extended duration.

### 4. *Good-Faith Efforts to Comply*

On this voluminous record, the Court cannot conclude that there have been any sustained, good faith efforts by Defendants to comply with the Clean Air Act and Clean Water Act. Even when the EPA gave Defendants notice of specific violations, Defendants often took years to comply. Kudarauskas testimony; Canzano testimony. Even after the complaint in this case was filed in April 2016, D. 1, there have been continuing violations, see Kudarauskas testimony (regarding 2017 loading event), and, even by Mr. Packer's telling, the businesses have only recently hired a compliance employee to maintain the regular and prompt inspection and reporting requirements that has been non-existent or lax over the years. The Court credits the testimony of Kudarauskas and Canzano and concludes that despite the efforts of the EPA over the course of years to prompt compliance by the Defendants, the businesses have not reciprocated in kind to do so, thus making this litigation (and the Court's orders) necessary.

5. *Seriousness of the Defendants' Violations*

Defendants did not offer any evidence to refute the testimony of Dr. Helen Suh or Jonathan Jones about the seriousness of the Clean Air Act violations and Clean Water Act violations, respectively. Dr. Suh testified about the health risks of increased benzene and ozone from the emissions from the Defendants' businesses, particularly as to vulnerable populations, given the Defendants' locations in New Bedford and Vineyard Haven, respectively. Suh testimony. Although there might be other sources of benzene in the atmosphere, there was no evidence of other sources of regular emissions like the Defendants nor was there any scientific basis to suggest that R.M. Packer's location on Vineyard Haven Harbor means that any wind more likely blows benzene away from the populated areas. Similarly, Jones's testimony that R.M. Packer's storage practices leave materials exposed to stormwater and that these practices violate Clean Water Act regulations and are not typical practices in the petroleum industry was not refuted. Jones testimony. As to the seriousness of R.M. Packer's stormwater violations, the Court credits his opinion that this non-compliance has led to discharge of pollutants into a "sensitive marine environment" (i.e., Vineyard Haven harbor). Jones testimony; Exh. 80.

6. *Size of Defendants' Business*

Against the factors above, the Court must consider the size of Defendants' operations and the economic impact of any penalty on Defendants. The Court agrees with the government that, but for these two factors, the other penalty factors would warrant a much larger penalty. D. 75 at 23. Although the government acknowledges that Defendants are on the smaller end of the businesses in their field, see Jones testimony, there was no testimony that compliance with long-standing environmental regulations are, even on average, harder to comply with for smaller companies than larger companies. Moreover, for one example, it is hard to square the reasonably

estimated costs of compliance (i.e., the $110,567 that R.M. Packer saved by not complying) as an insurmountable obstacle to R.M. Packer's compliance where there was unrefuted evidence that its gross, yearly profits were in the $1.4 to 2 million range. Meyer testimony. That is, compliance with environmental regulations is, and should be, part of the cost of doing business even for smaller companies.

## 7. *Economic Impact of Any Penalty on Defendants*

The only factor that Defendants more vigorously contest is that they will not be able to bear the burden of the penalty in excess of one million dollars that the government seeks here. Defendants' evidence, however, is not compelling on this point. The Court credits Dr. Meyer's testimony, based upon the financial statements of the Defendants and the "Consolidated Enterprise" (i.e., the Defendants and the inter-related companies, Exh. 292), accounting worksheets and related deposition testimony, that the Defendants, either as stand-alone companies or when considered as part of the Consolidated Enterprise, have the ability to pay a much larger fine (as much as $3.98 million if considering the Consolidated Enterprise and, more than the penalties being sought against each Defendant, if considered separately). Although Mr. Packer testified that the officers of the companies could not afford to repay the loans due to the companies, no supporting evidence as to which loans, which officers or in what amounts was offered. The Court has also considered the testimony of Sidney Richards, the long-time accountant for the Defendants. Even crediting Richards's testimony that some of the properties owned by the Consolidated Enterprises are subject to mortgages (in the range of $2.8-2.9 million dollars), that does not explain how the remaining value of same could not be accessed to pay the penalty. Similarly, even crediting his testimony that Defendants could not readily acquire new loans to pay the penalty, such testimony does not refute the significant assets (including, but not limited to,

estimated costs of compliance (i.e., the $110,567 that R.M. Packer saved by not complying) as an insurmountable obstacle to R.M. Packer's compliance where there was unrefuted evidence that its gross, yearly profits were in the $1.4 to 2 million range. Meyer testimony. That is, compliance with environmental regulations is, and should be, part of the cost of doing business even for smaller companies.

## 7. *Economic Impact of Any Penalty on Defendants*

The only factor that Defendants more vigorously contest is that they will not be able to bear the burden of the penalty in excess of one million dollars that the government seeks here. Defendants' evidence, however, is not compelling on this point. The Court credits Dr. Meyer's testimony, based upon the financial statements of the Defendants and the "Consolidated Enterprise" (i.e., the Defendants and the inter-related companies, Exh. 292), accounting worksheets and related deposition testimony, that the Defendants, either as stand-alone companies or when considered as part of the Consolidated Enterprise, have the ability to pay a much larger fine (as much as $3.98 million if considering the Consolidated Enterprise and, more than the penalties being sought against each Defendant, if considered separately). Although Mr. Packer testified that the officers of the companies could not afford to repay the loans due to the companies, no supporting evidence as to which loans, which officers or in what amounts was offered. The Court has also considered the testimony of Sidney Richards, the long-time accountant for the Defendants. Even crediting Richards's testimony that some of the properties owned by the Consolidated Enterprises are subject to mortgages (in the range of $2.8-2.9 million dollars), that does not explain how the remaining value of same could not be accessed to pay the penalty. Similarly, even crediting his testimony that Defendants could not readily acquire new loans to pay the penalty, such testimony does not refute the significant assets (including, but not limited to,

---

demand notes) that could be relied upon by the Defendants to satisfy the penalty, particularly as the Court is imposing that penalty in annual payments.

Accordingly, although the Court has considered the size of the Defendants and the economic impact of the penalty sought on them (and, without such consideration, would have imposed a greater penalty), the Court does not conclude on this record that the Defendants cannot reasonably bear the penalty it imposes or that a smaller penalty is warranted.

### B. Injunctive Relief

For the reasons stated above and in the attached transcript excerpt and based upon the trial testimony (particularly, Kudarauskas testimony and Canzano testimony), the Court concludes that the injunctive relief sought and imposed in D. 84 and D. 85 is warranted.

## IV. Conclusion

For the foregoing reasons, the Court ORDERS as follows:

1. R.M. Packer shall comply with the Order of Injunctive Relief, D. 85, previously entered;

2. Tisbury Towing shall comply with the Order of Injunctive Relief, D. 84, previously entered;

3. R.M. Packer shall pay a civil penalty of $1,157,000 to the United States.  Payment of this penalty shall be on the following schedule:  a) $115,700 shall be due and payable by November 30, 2019; and b) the remainder ($1,000,000) shall be due and payable in equal, yearly installments of $250,000 per year beginning on April 30, 2020;

4. Tisbury Towing shall pay a civil penalty of $143,000 to the United States.  Payment of this penalty shall be on the following schedule:  a) $14,300 shall be due and payable

by November 30, 2019; and the remainder ($128,700) shall be due in equal, yearly installments of $32,175 per year beginning on April 30, 2020.

**So Ordered.**

/s/ Denise J. Casper<br>United States District Judge